Kutsch et al., Appellants, *v.* Miller (et al., Appellant).

Argued October 7, 1969.  Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

reargument refused January 29, 1970.

*Lee C. McCandless,* for plaintiff.

*G. Donald Gerlach,* with him *John L. Wilson,* and *Reed, Smith, Shaw & McClay,* for defendant.

OPINION BY MR. JUSTICE JONES, January 9, 1970:

The first of these two appeals[1] presents the question of whether the owner of a deep bituminous mine, Bessemer and Lake Erie Railroad (Bessemer), may be held liable for the alleged negligent acts of its lessees, Sterling Coal Company (Sterling) and Clinton Coal Company (Clinton), which supposedly caused the flooding of an adjacent deep mine owned by Richard and Albert Kutsch (Kutsch). In an equity action instituted in the Court of Common Pleas of Butler County, the court, after hearings, imposed liability on Bessemer on the theory that "accumulations of water on [Kutsch'] property were produced, diverted and maintained artificially by and for the benefit of [Bessemer]" and that "Bessemer and its tenants had no right to collect water on the property of [Kutsch] and thereafter create a hazard to [Kutsch] and any employees [Kutsch] might have extracting coal from their own mine." We do not agree.

On March 29, 1961, Bessemer purchased a bituminous coal mine in Clinton Township, Butler County, known as the "Riddle Mine." Adjacent to the "Riddle Mine" was another mine which had been owned and operated by Kutsch since 1945. Both mines worked the same vein of coal, but, because of the topographical pattern of the vein, the vein worked in "Riddle Mine" was at a higher level than that worked in the Kutsch mine.

---

[1] An appeal (No. 224, March Term, 1969) was taken by Kutsch from the "Final Decree" of the court below on the ground said "Final Decree" modified the "Decree Nisi" without Kutsch having an opportunity to be heard in opposition to such modification. A motion to quash this appeal has been filed on the ground it was not filed within three calendar months of the date of the "Final Decree," to wit, March 3, 1969. An appeal (No. 217, March Term, 1969) was taken by Bessemer from the "Final Decree" on the ground it found Bessemer liable to Kutsch.

Some time prior to March, 1956, a predecessor in title of Bessemer, conducting mining operations in the "Riddle Mine," crossed the boundary line between the "Riddle Mine" and the Kutsch property, intruded therein for approximately 30 feet for a distance of 700 feet and removed virgin coal from the Kutsch property. This encroachment into the Kutsch property took place at the southeast corner of the "Riddle Mine."[2]

On April 1, 1961, Bessemer leased to Sterling the exclusive right to mine the Upper Freeport seam of the "Riddle Mine." This lease provided that: (1) Sterling was to do all the work and pay Bessemer a royalty of 20¢ per ton of coal mined; (2) Sterling was to keep accurate books to which Bessemer was to have reasonable access; (3) Sterling was to carry out its operations in a workmanlike and efficient manner, obeying the mining laws; (4) Bessemer retained the right to make reasonable inspections of Sterling's operations; (5) Sterling was to submit its mining plans to Bessemer six months prior to mining; and (6) in the event of unforeseen difficulties, the parties agreed to meet in order to draw up a revised mining plan. The last paragraph of the lease recited that Sterling was to be an independent contractor, with Bessemer having no supervision or control over the specific activities of Sterling in its mining operations.[3]

---

[2] This encroachment was shown on a map of the "Riddle Mine" dated March 17, 1956, and on all subsequent maps of the Riddle Mine. These maps were available, in accordance with the requirements of the Bituminous Coal Mine Act of 1961, 52 P.S. §701-237, at the office of the "Riddle Mine" and were also in the possession of the State Mining Inspector.

[3] Reading the language of the leases and attributing to such language the legal significance prescribed by our case law (*Greek Catholic Congregation of Olyphant Borough v. Plummer*, 338 Pa. 373, 12 A. 2d 435 (1940)), we find ourselves at variance with the interpretation placed on such language by the court below.

Sterling's mining operations progressed to the north, away from the Kutsch property and followed the naturally ascending pattern of the coal seam. Because the natural drainage pattern of the "Riddle Mine" was from the northwest to the southeast, any water released by Sterling's operations tended to flow by gravity toward the point at which there had been a wrongful intrusion into the Kutsch property by Bessemer's predecessor in title. Accordingly, as part of its operations, Sterling pumped the water from this low point in the "Riddle Mine" to the surface through a bore hole.

The Upper Freeport seam was also marked by small (five to seven feet) local dips and rises. In order to mine these areas, Sterling also pumped water out of the dips and over the rises, from where the water then flowed naturally down to the southeast portion of the "Riddle Mine."

When Sterling had removed all merchantable coal, in 1963, it abandoned this area of the mine and, of course, discontinued the aforementioned pumping operations. Since the drainage water was no longer being pumped out through the bore hole, it accumulated and flooded the lower, southeast portion of the mine—including that portion which was situated on the Kutsch property. Although Bessemer knew in 1963 that pumping from the bore hole had been discontinued, it was not until 1964 that it learned that all pumping had ceased and that water had been filling the southeast portion of the mine.

The flooding of mines, abandoned in whole or in part, although potentially hazardous, is neither novel nor rare. The hazard inherent in a flooded mine is that the flood waters may enter adjoining or adjacent mines, causing damage to the coal therein and possible injury or death to persons working in such mines. The only safeguard—save pumping of such waters to the

surface—lies in the barriers of coal left in place between adjoining or adjacent mines. Under several statutes,[4] the legislature, recognizing the potentiality of danger from waters accumulated in mining operations, has established a formula for the determination of the coal necessary to be left in place to provide a secure barrier between adjacent mines. The record indicates that, by the application of this formula, the total barrier between the "Riddle Mine" and the Kutsch mine should have been 46 feet, *i.e.*, 23 feet on each side of the boundary line between the respective mines. That such barrier was *not* maintained clearly appears of record.

In connection with the statutory inadequacy of the barrier pillar, it appears uncontradicted that the pillar coal was "robbed" on *both* sides of the boundary line. Prior to the acquisition of any interest by Bessemer in the "Riddle Mine," a predecessor in title "robbed" part of the barrier pillar. This predecessor of Bessemer not only did not leave the 23 feet of barrier on its side of the boundary line but intruded into the Kutsch property at least 30 feet. At that time the Kutsch mining operations were almost 60 feet from the property line between the two mines, so that Kutsch at that time was maintaining a proper statutory barrier of coal. For the encroachment of Bessemer's predecessor into Kutsch property and the "robbing" of the barrier at that point, it is not claimed, nor could it be, that Bessemer was liable.

However, some time between September, 1960, and February, 1963, either with knowledge or with reason to know, in the exercise of careful mining, of the encroachment of Bessemer's predecessor into the Kutsch property, Kutsch extended mining operations to with-

---

[4] Act of June 9, 1911, P. L. 756, repealed by the Bituminous Coal Mine Act of 1961, Act of July 17, 1961, P. L. 659, 52 P.S. §701-291.

in 7 feet of the "Riddle Mine" encroachment.[5] Thus, the barrier, the soundness of which had been threatened by the encroachment of Bessemer's predecessor, was further threatened by the Kutsch mining.

On February 25, 1963, the State Mining Inspector directed Kutsch to cease operations until the water could be removed from the southeast portion of the "Riddle Mine." The Inspector had determined that the seven-foot barrier between the two mines was inadequate and unsafe, in view of the flooding on the Riddle side of the barrier. Consequently, Kutsch moved their mining operations to a higher elevation where the men would not be endangered by the water should it break through. By letter of April 24, 1964, the State Inspector again ordered Kutsch to cease all mining operations at the lower level until the water in the "Riddle Mine" could be removed.

The complaint in this action, filed May 5, 1964, sought for Kutsch money damages and equitable relief, based upon the flooding which occurred after Bessemer took title. The Court of Common Pleas of Butler County entered judgment in favor of Kutsch in the amount of $3,300.00 with interest from April 1, 1964, and against Bessemer. The court absolved Clinton of any liability because it found that Clinton had not increased the water accumulation. Sterling, without explanation and by implication, was relieved of any liability.

The first, and controlling, question raised on this appeal by Bessemer is whether it could properly be held liable for allegedly tortious acts which were indisputably committed by Bessemer's lessees, rather than Bessemer itself. In *Offerman v. Starr*, 2 Pa. (Barr) 394 (1845), the defendant owned a mine and demised

---

[5] At this point, the Kutsch mine was still 37 feet away from their property line. The Riddle encroachment accounts for the extra 30 feet.

to one Lewis the right to extract the coal, reserving unto the defendant-lessor the right to enter the mine to inspect and examine Lewis' operations and the defendant also reserved the right to retake possession should the lessee breach the lease agreement in any way, including poor workmanship. As the result of the lessee's improper mining, plaintiff's land was damaged and the suit was brought against defendant-lessor. This Court pointed out that "[r]espondeat superior is inapplicable to an owner of land, for acts of negligence in a business not conducted by him and for his account." *Id.* at 396. The significance of the lessor's reservation of certain supervisory rights was discussed as follows, at pages 396-97: "These clauses do not constitute a reservation of the possession or a right to interfere with the direction of the business. . . . The lease was analogous in all respects to the lease of a farm with a clause of re-entry for bad farming, or nonpayment of rent. On no principle, then, could the acts of Lewis be imputed to his lessors." In *Greek Catholic Congregation of Olyphant Borough v. Plummer,* 338 Pa. 373, 378, 12 A. 2d 435 (1940), we stated: "It is settled law in this Commonwealth that the lessor of a coal mine is not responsible in trespass for the negligent mining by his lessee which results in damage to the surface." *Accord, Shenandoah Borough v. Philadelphia,* 367 Pa. 180, 187, 79 A. 2d 433, *cert. denied,* 342 U.S. 821 (1951). The lease in *Plummer,* as in *Offerman, Shenandoah,* and as in the instant case, also provided for inspection by the lessor of the lessee's operations. The Court discussed this aspect of the case as follows, at page 383: "Lessors of coal, whose remuneration depends on the tonnage mined, are properly vigilant in seeing to it that none of the coal is wasted by reckless, unskilful [sic] mining and to this end they customarily reserve the right to inspect the workings either by themselves or by a competent mining en-

gineer. That such a provision does not make the lessor a 'director' of the mining operation was expressly held by this court in Offerman v. Starr, 2 Pa. 394."

Kutsch contend in their brief that Bessemer is liable because the owner of land may be held responsible "where he has knowledge and tacitly consents in permitting a nuisance to exist." However, there has been no evidence presented by Kutsch to rebut the record testimony that Bessemer did not learn of the water accumulation prior to January, 1964, when Sterling's lease was terminated. Moreover, in the very case cited by Kutsch as authority on this point, *Whiteley v. Mortgage Service Co.*, 337 Pa. 475, 478, 12 A. 2d 9 (1940), the Court stated as follows: "Where, as here, an owner of leased premises, exercising no control over the acts of a tenant, has neither authorized, nor directly or indirectly participated in, the creation or continuance of a nuisance, he cannot be made answerable for the objectionable conduct of those occupying the premises."

There is no evidence in the present case that Bessemer *actually* exercised any supervision or control over its lessees other than to insure that all minable coal was extracted and that the royalties due were actually paid. Under the lease, Bessemer reserved no more *rights* to exercise supervision or control than were reserved in the *Shenandoah* case. Accordingly, we hold that the instant case comes within the general rule that a lessor is not liable for the torts of his lessee without proof of either the lessor's knowledge of the negligent acts, or of such reservation of rights in the lease as would indicate that the lessee was not actually an independent contractor. *Shenandoah Borough v. Philadelphia*, 367 Pa. 180, 79 A. 2d 433, *cert. denied*, 342 U.S. 821 (1951); *Greek Catholic Congregation of Olyphant Borough v. Plummer*, 338 Pa. 373, 12 A. 2d 435 (1940); *Whiteley v. Mortgage Service Co.*, 337 Pa. 475, 12 A. 2d 9 (1940); *Offerman v. Starr*, 2 Pa. (Barr) 394 (1845).

We fail to find any basis upon which to impose liability on Bessemer. The leases between Bessemer and Sterling and Bessemer and Clinton, viewed in the light of their language and the case law interpreting similar leases, vested no right of control or direction of the manner of mining in Bessemer. Even if the doctrine of respondeat superior were applicable—which it is not—it would be anomalous to hold the servants, Sterling and Clinton, free of fault and Bessemer, the master, liable for their fault. That water accumulated along the boundary line between the two mines is established, but such accumulation of water arose from a natural source—water in the upper levels seeping into the lower levels—and was not artificially created.[6] The hazard created by the accumulated water arose from the "robbing" of the barrier pillar, for which Bessemer was in no way liable and to which hazard Kutsch substantially contributed. Absent any basis in law or fact for the imposition of liability on Bessemer, the decree below must fall.

In view of our reversal of the decree, we need consider neither Kutsch's appeal from the decree nor the motion to quash that appeal.

Decree reversed. Costs on Kutsch.

Appeal to No. 224, March Term, 1969, dismissed. Costs on Kutsch.

---

[6] The cases relied on by the court below considered *artificially*-created conditions. See: *McCormack Coal Co. v. Schubert*, 379 Pa. 309, 108 A. 2d 723 (1954) ; *Rau v. Wilden Acres, Inc.*, 376 Pa. 493, 103 A. 2d 422 (1954).