404 A.2d 672

**Robert G. SINN and JoAnne Marie Sinn, Administrators of the Estate of Lisa Anne Sinn, Deceased, Deborah Frances Sinn, a Minor, by Robert G. Sinn, Her Natural Guardian, and JoAnne Marie Sinn**

v.

**Brad Lee BURD.**

**Appeal of JoAnne Marie SINN.**

Supreme Court of Pennsylvania.

Argued March 5, 1979.

Decided July 11, 1979.

Reargument Denied Aug. 22, 1979.

Jack A. Wintner, Carson & Wintner, McKeesport, for appellant.

Mark K. McNally, Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION

NIX, Justice.

At issue in this appeal is the vexing and complex question of when a plaintiff should be allowed to recover damages for negligently caused mental trauma.[1] The specific question presented for our review is whether the trial court properly sustained appellee's demurrer to the fourth count of appellant's complaint in which she sought to recover damages for physical and mental injuries incurred when she saw her minor daughter struck and killed by an automobile, although the plaintiff herself was not within any zone of personal physical danger and had no reason to fear for her own safety. For the reasons set forth below, we believe the demurrer was improperly sustained and therefore reverse the trial court and order the parties to proceed to trial on the fourth count of the complaint.

▇▇▇ It is axiomatic in the law of pleading that preliminary objections in the nature of a demurrer admit as true all well and clearly pleaded material, factual averments and all inferences fairly deducible therefrom. *Yania v. Bigan*, 397 Pa. 316, 155 A.2d 343 (1959); *Byers v. Ward*, 368 Pa. 416, 84 A.2d 307 (1951). Conclusions of law and unjustified inferences are not admitted by the pleading. *Lerman v. Rudolph*, 413 Pa. 555, 198 A.2d 532 (1964). Starting from this point of

---

1. In *Knaub v. Gotwalt*, 422 Pa. 267, 220 A.2d 646 (1966) a majority of this Court was gently chided by one of its members for its conservatism in this area:

    It is a matter of infinite regret to me that in the train of Progress in the Law of Humanity, Pennsylvania is a car frequently clattering close to the caboose instead of cheerfully gliding over the rails immediately behind the locomotive.

    *Id.*, 422 Pa. at 273, 220 A.2d at 648 (Musmanno, J., dissenting). Without passing upon the legitimacy of the Musmanno observation at the time that it was made, it is nevertheless now apparent that it is appropriate for a reassessment in this area at this time in light of the major advancements in the fields of medicine and psychiatry and our changing views as to legal responsibility.

reference the complaint must be examined to determine whether it sets forth a cause of action which, if proved, would entitle the party to the relief sought. If such is the case, the demurrer may not be sustained. On the other hand, where the complaint fails to set forth a cause of action, a preliminary objection in the nature of a demurrer is properly sustained. Finally, where the propriety of an order sustaining a demurrer is being reviewed by a court of last resort, the fact that the theory for recovery relied upon has not been previously sanctioned, is not conclusive. It must be remembered that "[e]very cause of action . . ., however, was once a novel claim, and the absence of Pennsylvania authority for appellant's proposition is not an end to the issue." *Papieves v. Kelly*, 437 Pa. 373, 376–77, 263 A.2d 118, 120 (1970).

The averred facts are as follows. Appellant JoAnne Marie Sinn lived with her husband and two minor children in Elizabeth Township, Allegheny County. On June 12, 1975, at approximately 5:53 p. m., the deceased, Lisa Sinn, and her sister, Deborah, were standing by the Sinn's mail box located along side the Greenock-Buena Vista Road, approximately 36 feet from the nearest intersection. An automobile operated by the appellee struck Lisa and hurled her through the air, causing injuries which resulted in her death. Deborah was not struck by the vehicle, although it narrowly missed her. Appellant witnessed the accident from a position near the front door of her home. The Sinns filed a four-count trespass complaint against appellee on June 3, 1976. The first and second counts were brought under the Wrongful Death and Survival acts, respectively. The third count was brought for Deborah for psychological damages she sustained as a result of watching her sister die.[2]

2. The third count avers that:
  19. Although she was not struck by Defendant's automobile, the Plaintiff was horrified and greatly shaken as Defendant's automobile struck and killed her sister only a few feet away from the spot on which Plaintiff was standing.
  20. As a result of viewing the aforementioned accident, the Plaintiff suffered a shock to her nervous system, and sustained

The fourth count was brought by appellant for damages she sustained from the emotional stress of witnessing her daughter's death. It states, *inter alia* :

22. Plaintiff, JoANNE MARIE SINN, is the mother of LISA ANNE SINN, deceased, and resides in the Township of Elizabeth, County of Allegheny, Pennsylvania.

\* \* \* \* \* \*

24. Defendant's vehicle did not strike Plaintiff.

25. At the time of the aforesaid accident, the Plaintiff was observing the deceased from a position at or near the front door of her home.

26. The Plaintiff became hysterical, unnerved, and emotionally shattered as she viewed the Defendant's automobile strike and kill her daughter, LISA ANNE SINN.

27. As a result of watching the aforementioned accident, the Plaintiff suffered a shock to her nerves and nervous system, and sustained grievous mental pain and suffering resulting in severe depression and an acute nervous condition.

28. As a result of the foregoing, Plaintiff was required to expend money for medicines and/or tranquilizers, and may be required to expend considerable sums for the treatment of her resulting injuries and mental suffering in the future.[3]

grievous mental pain and suffering resulting in severe depression. The Plaintiff is further tortured by nightmares of said accident and suffers from a general inability to sleep peacefully throughout the night. The residual and results of the foregoing may be permanent in nature and significance.

Brad Lee Burd has not appealed from the refusal of the Court of Common Pleas to strike the third count of the complaint. Consequently, the propriety of that decision is not before us.

3. In his dissenting opinion, Mr. Justice ROBERTS inaccurately accuses this Court of subverting the Wrongful Death Act, Act of April 26, 1855, P.L. 309, § 1, as amended, 12 P.S. §§ 1601–04 (1953), and characterizes the present suit as one seeking *solatium.* The Wrongful Death Act compensates the decedent's survivors for the pecuniary losses they sustained as a result of the decedent's death. The measure of damages for the death of a minor in such an action consists of funeral and medical expenses, plus the total earnings which would have been earned by the child up to the age of 21,

Appellee filed preliminary objections in the nature of a demurrer to the third and fourth counts claiming that the complaint failed to aver that Deborah and appellant were in personal danger of physical impact, that they feared such physical impact, or that they suffered physical injury as a result of the emotional distress caused by the accident. The Allegheny County Court of Common Pleas Civil Division, sitting *en banc*, overruled the demurrer as to the third count but sustained it as to the fourth. Based on its reading of *Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84 (1970), and subsequent Superior Court decisions, that court ruled that while Deborah was within the zone of danger and hence could proceed with her action, appellant was not within the zone of danger. Appellant appealed to the Superior Court which affirmed without opinion. *Sinn v. Burd,* 253 Pa.Super. 627, 384 A.2d 1003 (1978). We granted allocatur.

## I.

Prior to the beginning of this decade, this state was a firm adherent to the "impact rule" regulating recovery for dam-

minus the cost of maintaining the child during this period, with the resulting amount reduced to its present worth. *Swartz v. Smokowitz,* 400 Pa. 109, 112–13, 161 A.2d 330 (1960). In the Fourth Count of her complaint, Mrs. Sinn does not seek such damages, rather she seeks damages for the emotional injuries she sustained as a result of witnessing the accident. These damages are not to be confused with the concept of *solatium.* Solatium, or solace, describes a type of monetary damages awarded the decedent's survivors to recompense them for their feelings of anguish, bereavement, and grief caused by the fact of the decedent's death. Although most civil law nations provide such damages for the bereaved relatives, it has been steadfastly rejected by the common law. *See* Speiser & Malawer, An American Tragedy: Damages for Mental Anguish of Bereaved Relatives in Wrongful Death Actions, 51 Tulane L.Rev. 1 (1976). Mrs. Sinn is not seeking damages to soothe her grief resulting from the loss of her child; instead, she seeks damages for the mental distress caused by the shock of actually witnessing her child being struck and killed. These damages are independent of her grief and bereavement. Both *solatium* and wrongful death actions are intended to compensate the decedent's survivors for the loss—affectional and pecuniary, respectively—they incurred as a result of the death. By contrast, in the present action Mrs. Sinn seeks recompense for an independent injury inflicted upon her by the defendant: the negligent infliction of mental distress.

ages in tort. *See, e. g., Knaub v. Gotwalt,* 422 Pa. 267, 270, 220 A.2d 646, 647 (1966) and cases cited therein.[4] This rule prevented the complaining party from recovering damages for injuries resulting from fright, nervous shock, or mental or emotional disturbances, unless this distress was accompanied by physical impact—*i. e.,* physical injury—upon the person of the complaining party. Our cases applied this rule with obstinate rigidity[5] in that recovery was denied not only when the complaining party was a nearby witness, but also to the actual victim of the tortfeasor's negligent or frightening conduct. *See, e. g., Bosley v. Andrews,* 393 Pa. 161, 142 A.2d 263 (1958).

In the first month of this decade, this Court joined the ranks of forward-looking jurisdictions and abandoned the impact rule in *Niederman v. Brodsky,* 436 Pa. 392, 261 A.2d 84 (1970) (*Niederman* ). In *Niederman,* an automobile skidded onto a sidewalk, narrowly missed the plaintiff, but struck his son who was standing beside him. The plaintiff, although untouched by the automobile, suffered a heart attack which required hospitalization. The trial court dismissed plaintiff's complaint for its failure to allege any physical impact. In an opinion by Mr. Justice Roberts, this Court reversed the dismissal, abandoned the impact rule, and adopted the zone of danger theory. That is, "where the plaintiff was in personal danger of physical impact because of the direction of a negligent force against him and where plaintiff actually did fear the physical impact," *Niederman* at 413, 261 A.2d at 90, he could recover for the shock, mental pain, and physical injuries attendant to the negligent incident even though he was not struck by the negligent force.

4. For the development of this rule in Pennsylvania, *see* 39 Temp.L.Q. 229 (1966).

5. The reason for this position was the grave concern that "[i]f we permitted recovery in a case such as this, our Courts would be swamped by a virtual avalanche of cases for damages for many situations and cases hitherto unrecoverable in Pennsylvania." *Knaub v. Gotwalt,* 422 Pa. 267, 271, 220 A.2d 646, 647 (1966). *See, Bosley v. Andrews,* 393 Pa. 161, 168–69, 142 A.2d 263, 266–67 (1958).

In so doing, we recognized that our decision was compelled by the "inherent humanitarianism of our judicial process." *Id.*, 436 Pa. at 404, 261 A.2d at 85. Furthermore, the three basic arguments supporting the impact rule had been eroded away by societal and technological advancements. We consequently rejected the arguments that medical science would be unable to prove a causal nexus between the claimed damages and the alleged fright or mental distress, *id.*, 436 Pa. at 405–08, 261 A.2d at 86–87; that the possibility of recovery in such cases would encourage fictitious injuries and fraudulent claims, *id.*, 436 Pa. at 408–11, 261 A.2d at 87–89; and that the courts would be swamped by a virtual avalanche of cases, *id.*, 436 Pa. at 411–13, 261 A.2d at 89.

It was not until mid-decade that the appellate courts of this state were presented with the question of whether a bystander outside the zone of physical danger could recover for physical or mental injury caused by viewing the serious injury or death of a loved one. In *Scarf v. Koltoff*, 242 Pa.Super. 294, 363 A.2d 1276 (1976), a husband, while crossing the street was struck and injured by a vehicle negligently driven by the defendant. The victim's wife witnessed the accident and as a result of the shock of the experience, she suffered a myocardial infarction or aggravation of a pre-existing cardiac condition, and died two months later. The man survived his injuries and brought survival and wrongful death actions based upon the death of the wife. These actions were dismissed by the trial court and the Superior Court affirmed, citing the failure of the complaint to allege that the wife was herself in danger of physical impact or that she feared such impact. The Superior Court recognized that our *Niederman* decision required such a possibility of fear of physical impact as a predicate to successful recovery on the part of the wife's estate. Additionally, that court found two policy reasons against extending coverage to bystanders such as the wife: the problem of unlimited and unduly burdensome liability, and the difficulty of reasonably circumscribing the area of liability. *See* 242 Pa.Super. at 299, 363 A.2d at 1279. In so ruling, the Superior Court

relied heavily upon the New York case of *Tobin v. Grossman*, 24 N.Y.2d 609, 301 N.Y.S.2d 554, 249 N.E.2d 419 (1969).

Building upon the *Scarf* and *Niederman* decisions, the Superior Court found that the plaintiff was within the zone of danger in *Bowman v. Sears, Roebuck & Co.*, 245 Pa.Super. 530, 369 A.2d 754 (1976). Ms. Bowman and her two adult daughters were shopping in a Sears store when Ms. Bowman saw five men employed by the store accost and forcibly remove her daughters from the shopping area. The daughters were detained for thirty minutes and upon their return, found their mother in a state of great anxiety which led to her suffering a heart attack. Ms. Bowman's complaint for damages alleged that her injury resulted not only from the mental anguish and shock of seeing the assault upon her daughters, but also from her own fear of physical attack by the same store employees. The Superior Court found that the mother had pleaded a claim within the zone of danger theory and thus presented a triable question of fact for the jury.

## II.

In *Niederman* we stated that:

[i]t is fundamental to our common law system that one may seek redress for every substantial wrong. The best statement of the rule is that a wrong-doer is responsible for the natural and proximate consequences of his misconduct.

*Niederman* at 403, 261 A.2d at 85.

The zone of danger concept was our attempt to provide meaningful redress for damages caused by mental distress.

Since the *Niederman* decision, experience has taught us that the zone of danger requirement can be unnecessarily restrictive and prevent recovery in instances where there is no sound policy basis supporting such a result.[6] It has unquestionably not been effective in every instance of assur-

6.   In cases involving negligent conduct toward third persons, the "field of danger" test is clearly arbitrary in at least one instance. If plaintiff witnessed the negligent infliction of an injury to a member of his or her immediate family and suffered emotional

ing that one may "seek redress for every substantial wrong." The restrictiveness of the zone of danger test is glaringly apparent where it is allowed to deny recovery to a parent who has suffered emotional harm from witnessing a tortious assault upon the person of his or her minor child. A majority of the commentators and a growing number of jurisdictions have considered this problem in recent years and have concluded that it is unreasonable for the zone of danger requirement to exclude recovery in such cases.[7]

This new awareness of the unfairness of the zone of danger requirement in these cases is based upon the implicit

> harm as a result, to deny recovery merely because plaintiff was not subjected to the same risk of injury as his or her spouse, child or parent is unjust. A severe emotional injury to plaintiff is clearly foreseeable under such circumstances, and it therefore would not be an unreasonable extension of defendant's duty of care to impose liability. Comment, 1977 Wisc.L.Rev. 1089, 1108 (1977) (footnotes omitted).

7. When the Restatement (Second) of Torts was adopted in 1965, the American Law Institute eliminated a caveat to section 313 of the original Restatement of Torts suggesting that a parent or spouse might be entitled to recover for harm suffered as a result of injury to a child or spouse. The 1965 revision recognized that the courts had almost uniformly refused to allow such recoveries. "[D]espite the feeling of a number of those present at the Institute meeting, that the situation of a mother who sees her child negligently killed before her eyes is one in which recovery would be justified," Restatement (Second) Torts, § 313, Appendix at 11, the caveat was deleted and replaced by section 313(2).

Since 1965, a number of courts have considered this question and have allowed a parent or spouse to recover even when the plaintiff was beyond the zone of danger. *See, e. g., Dziokonski v. Babineau,* —— Mass. ——, 380 N.E.2d 1295 (1978) (mother suffered fatal heart attack upon coming to the scene of where her minor daughter had been struck by an automobile moments earlier, father suffered heart attack upon learning of his wife's death and his daughter's injuries); *D'Ambra v. United States,* 338 A.2d 524 (R.I.1975) (mother saw her four-year-old son struck and killed by mail truck); *Leong v. Taka-saki,* 55 Haw. 398, 520 P.2d 758 (1974) (ten-year-old boy saw step-grandmother struck and killed by an automobile); *D'Amicol v. Alva-rez Shipping Co., Inc.,* 31 Conn.Sup. 164, 326 A.2d 129 (Super.Ct. 1973) (mother and father saw their child killed in an automobile accident); *Toms v. McConnell,* 45 Mich.App. 647, 207 N.W.2d 140 (1973) (mother saw her nine-year-old daughter struck and killed by a truck); *Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316 (1968) (mother saw her daughter struck and killed by an automobile).

acceptance that the emotional impact upon a parent witnessing the killing of a minor child is at least as great and as legitimate as the apprehension that is inspired by a plaintiff being personally within the zone of danger. Dissatisfaction with the zone of danger concept was explained in this manner by one commentator:

> Insofar as the "field of danger" test in third party cases was designed to serve the general policies of (1) protecting the court system against fraudulent or trivial claims by frustrating suits instituted by uninvolved bystanders who merely happen to witness an accident, and (2) protecting defendants from liability for an injury which results more from the particular emotional makeup of plaintiff than from the nature of defendant's actions, court reluctance to impose liability for emotional harm to eyewitnesses in general is understandable. In at least one instance, however, the rule fails to serve these policy objectives. A severe emotional injury to a parent who witnesses the negligent killing of his or her child is certainly foreseeable. An emotional injury claim in such an instance would hardly be frivolous or trivial, nor would it be unjust to defendant.

> \* \* \* \* \* \*

> In cases involving peril or harm to another, the "field of danger" test is unnecessary to protect the integrity of the judicial system or to avoid burdening defendant with unforeseeable injuries in cases where plaintiff witnesses harm to an immediate family member.

> Comment, 1977 Wisc.L.Rev. 1089, 1096 (1977) (footnotes omitted).

Applications of the zone of danger test to situations where the death or serious injury of a child is witnessed by a parent creates the very evil that the test was designed to eliminate, i. e., arbitrariness. It would bar recovery depending upon the position of the plaintiff at the time of the event, and ignores that the emotional impact was most probably influenced by the event witnessed—serious injury

to or death of the child—rather than the plaintiff's awareness of personal exposure to danger.[8]

Our cases have recognized five policy arguments relevant to bystander recovery. They are medical science's supposed difficulty in proving causation between the claimed damages and the alleged fright, the fear of fraudulent or exaggerated claims, the concern that to allow such a recovery will precipitate a veritable flood of litigation, the problem of unlimited and unduly burdensome liability, and the difficulty of reasonably circumscribing the area of liability. We will discuss them *seriatim*.

Medical science is able to supply a causal link between the psychic damage suffered by the bystander and the shock or fright attendant to having witnessed the accident.

It has long been assumed that medical science is unable to establish that the alleged psychic injuries in fact resulted from seeing a gruesome accident. *See, e. g., Huston v. Freemansburg Boro.*, 212 Pa. 548, 550, 61 A. 1022 (1905), describing a cause of action for mental disturbance as being intangible, untrustworthy, illusory, and speculative.[9] Ad-

---

8. The wisdom and the justice of cutting off a bystander's potential recovery on a *per se* basis simply because the person was situated beyond the zone of danger has been soundly criticized. *See, e. g.*, 43 N.Y.U.L.Rev. 1252, 1253 (1968) ("instead of weighing the justifications for allowing or denying recovery, most courts merely assert that in such cases the defendant has no duty to the plaintiff"); Comment, Negligently Inflicted Mental Distress: The Case for an Independent Tort, 59 Geo.L.J. 1237, 1245 (1971).

9. As late as 1966, our decisions were blindly applying this assumption with talismanic fervor and without supporting citations to scientific or medical authority. *See, e. g., Knaub v. Gotwalt*, 422 Pa. 267, 271–72, 220 A.2d 646, 647 (1966), *quoting Bosley v. Andrews*, 393 Pa. 161, 168–69, 142 A.2d 263 (1958) (also devoid of supporting citations).

Professor David Leibson wrote that this assumption:

. . . was certainly a product of its time. It was a time when medical science, especially that branch concerned with the study of emotions, was in its infancy. The courts regarded with suspicion complainants who experienced no physical injuries but who maintained they suffered grievous emotional damage. At that time, there was no assurance that psychiatric study had become sophisticated enough to satisfactorily establish a cause and effect relationship between the injury and the incident which allegedly gave

vancements in medical and psychiatric science throughout this century have discredited these hoary beliefs. *Niederman*, 436 Pa. at 405–08, 261 A.2d at 86–87.[10] One commentor concisely answered this question in 63 Geo.L.J. 1179, 1184–85 (1975):

> The growing competence of medical science in the field of psychic injuries has diminished the problems of proof in mental distress cases. The development of psychiatric tests and the refinement of diagnostic techniques has led some authorities to conclude that science can establish with reasonable medical certainty the existence and severity of psychic harm. In cases involving negligently inflicted mental distress, however, changes in the law have not kept pace with the increased sophistication of psychiatry. Special rules created to deal with problems of proof that were a legitimate concern in mental distress cases 50 years ago have restricted modern courts in their handling of these claims. (footnotes omitted.)

Additionally, as we stated in the *Niederman* case:

> rise to it. Indeed, courts were reluctant even to recognize the existence of damages in such a case because, at that time, there was no universal acceptance of the fact that emotional problems could be triggered by a single event and that, with care and treatment, they could be cured. The medical profession itself gave such an idea little thought. For a long time, insanity and other emotional illnesses were considered to be the result of one's own sins.
>
> Leibson, Recovery of Damages for Emotional Distress Caused By Physical Injury to Another, 15 J. Family L. 163, 163–64 (1976–77).

**10.** *Tobin v. Grossman*, 24 N.Y.2d 609, 613, 301 N.Y.S.2d 554, 556, 249 N.E.2d 419 (1969) ("mental traumatic causation can now be diagnosed almost as well as physical traumatic causation"). *See also, Leong v. Takasaki*, 55 Haw. 398, 520 P.2d 758, 766–67 (1974); Leibson, *supra* note 9 at 164, 190–209; Simons, Psychic Injury and the Bystander: The Transcontinental Dispute Between California and New York, 51 St. John's L.Rev. 1, 22–29 (1976); Comment, Negligently Inflicted Mental Distress, *supra* note 8, at 1248–63; Cantor, Psychosomatic Injury, Traumatic Psychoneurosis, and Law, 6 Cleve.-Mar.L.Rev. 428, 430–37; Smith, Relations of Emotions to Injury and Disease, 30 Va.L.Rev. 193, 303–04 (1943); Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harv.L.Rev. 1033 (1936).

Finally, even if we assume *arguendo* that a great deal of difficulty still remains in establishing the causal connection, this still does not represent sufficient reason to deny appellant an *opportunity* to prove his case to a jury. There is no reason to believe that the causal connection involved here is any more difficult for lawyers to prove or for judges and jurors to comprehend than many others which occur elsewhere in the law  .   .   .   [I]n any event, difficulty of proof should not bar the plaintiff from the opportunity of attempting to convince the trier of fact of the truth of her claim.

*Niederman* at 408, 261 A.2d at 87 (emphasis in the original).

Advancements in modern science lead us to further conclude that psychic injury is capable of being proven despite the absence of a physical manifestation of such injury. Some courts in abandoning the impact rule permit recovery for emotional distress only where the plaintiff can prove that the psychic injury caused her to suffer physical damage as well. *See, e. g., Dziokonski v. Babineau*, 380 N.E.2d 1295 (Mass.1978); *Hughes v. Moore*, 214 Va. 27, 197 S.E.2d 214 (1973). This requirement of resulting physical injury is another synthetic device to guarantee the genuineness of the claim. *Leong v. Takasaki*, 55 Haw. 398, 520 P.2d 758, 763 (1974); Bystander's Recovery for Negligently Inflicted Mental Distress, 29 Ark.L.Rev. 562, 564 (1976). We agree with the *Leong* court that

[b]ecause other standards exist to test the authenticity of plaintiff's claim for relief, the requirement of resulting physical injury, like the requirement of physical impact, should not stand as another artificial bar to recovery, but merely be admissible as evidence of the degree of mental or emotional distress suffered.

*Leong v. Takasaki*, 520 P.2d at 762.

Bystander recovery will not open the courthouse door to fictitious injuries and fraudulent claims.

Courts upholding and those courts denying bystander recovery agree that concern over fraud is without justifica-

tion. *See, e. g., Tobin v. Grossman,* 24 N.Y.2d 609, 615, 249 N.E.2d 419, 422, 301 N.Y.S.2d 554, 558–59 (1969) (denying recovery); *Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 77, 441 P.2d 912 (1968) (allowing recovery). The commentators are in accord with the judicial rejection of this argument.[11] One medicolegal expert takes the view that with the development of medical and psychiatric understanding of methods of ascertaining psychic injury, "[v]ery rarely, today, can a malingerer recover damages." Cantor, Psychosomatic Injury, Traumatic Psychoneurosis, and Law, 6 Cleve.-Mar.L.Rev. 428, 435 (1957). *See also, id.,* at 435–37.

The reasons that compelled us to reject this argument in *Niederman* are equally valid today:

[W]e are unable to accept the proposition that our courts and the judicial system in general cannot deal with fraudulent claims when they arise. Factual, legal, and medical charlatans are unlikely to emerge from a trial unmasked. This same thought has been given compelling exposition in recent opinions by the highest courts of our neighboring states, Delaware, New Jersey, and New York. We, of course, join these and other authorities in rejecting as patently fallacious the argument that would bar actions such as appellant's because some other litigants might present false or feigned claims. "Public policy requires the courts, with the aid of the legal and medical profes-

11. A contrary position would not only exhibit a cynical lack of faith in the entire judicial system, but would also penalize the honest because of the potential activities of the dishonest. The overwhelming trend today is to reject potential fraud as a ground for denying relief.

Simmons, *supra,* note 10, at 13.

One student of this field has written that:

"Any rule which seeks to bar fraud incidently by withholding legal protection from all claims, just and unjust, employs a medieval technique which, however satisfying it may be to defendants and defense attorneys, is scarcely in keeping with the acknowledged function of a modern legal system."

Bystander's Recovery for Negligently Inflicted Mental Distress, 29 Ark.L.Rev. 562, 564–65 (1976), *quoting* Leflar & Sanders, Mental Suffering and Its Consequences, 7 Univ.Ark.L.Schl.Bul. 43, 60 (1939). *See also,* Leibson, *supra* note 9, at 174; Smith, *supra* note 10, at 303–04.

sions, to find ways and means to solve satisfactorily the problems thus presented—not expedient ways to avoid them." *Robb v. Pennsylvania Railroad Company*, 210 A.2d (709) at 714.

*Neiderman*, 436 Pa. at 410–11, 261 A.2d at 88–89 (footnotes omitted).

The fear of a flood of similar litigation is an insufficient reason to deny bystander recovery.

This consideration focuses upon the belief that to grant recovery in the instant case would cause our courts to "be swamped by a virtual avalanche of cases." *Knaub v. Gotwalt*, 422 Pa. at 271, 220 A.2d at 647. Again, commentators and courts on both sides of the recovery issue agree that this fear is specious.[12] As we stated in *Niederman* :

12. *Compare, Tobin v. Grossman,* 24 N.Y.2d 609, 615, 301 N.Y.S.2d 554, 558, 249 N.E.2d 419, 422 (1969) (denying recovery) ("This court has rejected as a ground for denying a cause of action that there will be a proliferation of claims. It suffices that if a cognizable wrong has been committed that there must be a remedy, whatever the burden of the courts."), *with Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 77 n.3, 441 P.2d 912, 917 n.3 (1968) (allowing recovery) ("we point out that courts are responsible for dealing with cases on their merits, whether there be few suits or many; the existence of a multitude of claims merely shows society's pressing need for legal redress.") In *Toms v. McConnell,* 45 Mich.App. 647, 207 N.W.2d 140, 145 (1973) (allowing recovery), the court did not consider this argument to be worthy of discussion. *See also, D'Ambra v. United States,* 114 R.I. 643, 338 A.2d 524, 530 (1975) (allowing recovery).

The commentators have agreed that this argument is without merit. One writer noted that "those courts which have relaxed their limitations on recovery of this type have not experienced any substantial increase in litigation." Negligent Infliction of Mental Distress: Reaction to *Dillon v. Legg* in California and Other States, 25 Hastings L.J. 1248, 1250 (1974). *See also,* Simons, *supra* note 10, at 12–13; Comment, *supra* note 8, at 1244–45.

California has allowed bystanders to recover since the 1968 *Dillon* opinion. In that time only two reported decisions have found in favor of the plaintiff and in both cases only to the extent of reversing summary judgment against them. *See Mobaldi v. Board of Regents,* 55 Cal.App.3d 573, 127 Cal.Rptr. 720 (1976) (child died in foster mother's arms after hospital negligently administered wrong dosage of medicine); *Archibald v. Braverman,* 275 Cal.App.2d 253, 79 Cal. Rptr. 723 (1969) (mother saw child's mangled arm immediately after explosion caused by gunpowder negligently sold to him). It would therefore appear that the argument does not offer a legitimate con-

[T]he fundamental concept of our judicial system [is] that any [caseload] increase should not be determinative or relevant to the availability of a judicial forum for the adjudication of impartial individual rights. "It is the business of the law to remedy wrongs that deserve it, even at the expense of a 'flood of litigation'; and it is a pitiful confession of incompetence on the part of any court of justice to deny relief upon the ground that it will give the courts too much work to do." Prosser, Intentional Infliction of Mental Suffering: A New Tort, 37 Mich.L.Rev. 874 (1939). We obviously do not accept the "too much work to do" rationale. We place the responsibility exactly where it should be: not in denying relief to those who have been injured, *but* on the judicial machinery of the Commonwealth to fulfill its obligation to make itself available to litigants. Who is to say which class of aggrieved plaintiffs should be denied access to our courts because of speculation that the workload will be a burden? Certainly this Court is unwilling to allow such considerations to influence a determination whether a class of litigants will be denied or permitted to seek adjudication of its claims. See *Robb v. Pennsylvania Railroad Company,* 210 A.2d at 714 (Del.1965) ("if there be increased litigation, the courts must willingly cope with the task"); . . .

*Niederman,* 436 Pa. at 412, 261 A.2d at 89 (footnotes omitted).

Bystander recovery would not present a problem of unlimited or unduly burdensome liability.

This is the heart of the controversy raised by the instant appeal. Under either the impact theory which required a "battery" to the plaintiff, or the later developed zone of danger concept which required an "assault" upon the plaintiff, the courts remained securely ensconced within traditionally recognized areas of tort responsibility. Here the appellant is seeking recovery for injuries sustained as a result of witnessing a "battery" upon another. In consider-

sideration and that the anticipated consequences are grossly overstated.

ing the wisdom of extending civil liability for tortious conduct, courts have been inclined to impose a duty where public policy demands that "as between the tortfeasor who started the chain of circumstances resulting in the injury and the entirely innocent plaintiff, the tortfeasor should suffer the consequences." Bystander Recovery for Mental Distress, 37 Fordham L.Rev. 429, 449 (1969) quoting McNiece, Psychic Injury and Tort Liability, 24 St. John's L.Rev. 1, 77 (1949).

The more complex and interwoven societal relations become the greater the responsibility one must accept for his or her conduct. In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than "the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection" from the harm suffered. *Leong v. Takasaki,* 55 Haw. 398, 520 P.2d 758, 764 (1974). To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times. The late Dean Prosser expressed this view as follows:

> These are shifting sands, and no fit foundation. There is a duty if the court says there is a duty; the law, like the Constitution, is what we make it. Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question. When we find a duty, breach and damage, everything has been said. The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none. In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, "always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind."

Prosser, *Palsgraf Revisited,* 52 Mich.L.Rev. 1, 14–15 (1953).[13]

The Rhode Island Supreme Court recently examined the questions of duty and the demands of public policy in *D'Ambra v. United States,* 114 R.I. 643, 338 A.2d 524 (1975), a case factually similar to the one now before us.[14] In permitting the bystanding mother to recover, that court found that the defendant did owe a duty of care to the bystander. In analyzing the policies underpinning this duty, the court stated:

The scope of potential liability commonly finds theoretical expression in such concepts as duty and proximate cause. These are, however, exceedingly elastic notions which, instead of dictating an answer to whether the plaintiff has stated a cause of action against the defend-

**13.** Before we proceed to deny a cause of action on the ground of public policy, the following cautionary statement should be given careful consideration:

. . . it must be borne in mind that the general theory upon which the common law is based is that there is a remedy for every wrong, and in any case in which A is shown to have committed a wrongful act as a proximate result of which B has suffered damage, there is a very strong presumption in favor of a right of action by B against A. If B's right to maintain such an action is denied on the ground of public policy, such policy must be made very clearly to appear and must be strongly grounded on considerations of public welfare. Throckmorton, Damages for Fright, 34 Harv.L.R. 260, 264 (1920–21).

**14.** The *D'Ambra* case was originally brought in the United States District court for the District of Rhode Island under the Federal Tort Claims Act. The D'Ambras, husband and wife, sought to recover for injuries sustained by Mrs. D'Ambra as a result of shock and physical manifestations thereof she suffered from witnessing her infant son being struck and killed by a negligently driven United States mail truck. Chief Judge Pettine denied the government's motion to dismiss for failure to state a cause of action, *D'Ambra v. United States,* 354 F.Supp. 810 (D.R.I.1973). The United States Court of Appeals affirmed the subsequent finding of liability but remanded for a recalculation of damages, *D'Ambra v. United States,* 481 F.2d 14 (1st Cir. 1973). The First Circuit subsequently certified the question of liability to the Supreme Court of Rhode Island which concurred in the imposition of liability, *D'Ambra v. United States,* 338 A.2d 525 (R.I.1975). The case was then returned to the federal courts and the First Circuit again affirmed the trial court's finding of liability, *D'Ambra v. United States,* 518 F.2d 275 (1st Cir. 1975).

ant, merely reformulate the question. They are, indeed, merely reductions of the multi-faceted mores of the community, easily expressible formuli for the core problem of whether the law will countenance a shifting of the burden of loss. As Professor Prosser has noted:

> " * * * the problem of duty is as broad as the whole law of negligence, and that no universal test for it ever has been formulated. It is a shorthand statement of a conclusion, rather than an aid to analysis in itself. * * But it should be recognized that 'duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection".

Prosser, Torts § 53 (4th ed. 1971).

Likewise, Justice Andrews, in his famous dissent in *Palsgraf v. Long Island R. R.*, 248 N.Y. 339, 162 N.E. 99 (1928) wrote:

> "What we do mean by the word 'proximate' is that, because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics."

*Id.*, at 526–27

The leading decision espousing denial of recovery in these instances is that of *Tobin v. Grossman,* 24 N.Y.2d 609, 301 N.Y.S.2d 554 (1969).[15] The New York Court in *Tobin* argued

---

**15.** The issue before the *Tobin* court was whether a mother could recover for her own mental and physical injuries caused by shock and fear for her two-year-old child who suffered serious injuries when he was struck by a negligently operated automobile. The accident did not occur in the mother's presence; she was inside a neighbor's home, outside of which the momentarily unattended child was struck, and the mother did not see the accident. She did hear the screech of brakes, note the absence of her child, went instantly outside, and saw him lying on the grounds. 24 N.Y.2d at 612, 301 N.Y.S.2d at 556. It should be noted that the facts of the case presently before us are markedly different in that Mrs. Sinn actually saw the defendant's vehicle strike and kill her daughter. The *Tobin* Court, in denying recovery by third parties under *any* circumstances, did not distinguish between these two distinct factual settings. Our decision today is limited solely to those cases in which the plaintiff

that the extension of liability for damages sustained by third parties beyond the zone of danger would represent the creation of a new duty and that "there are no new technological, economic, or social developments" which would warrant the recognition of a new cause of action. *Id.* at 615, 301 N.Y.S.2d at 558. First, we suggest that the *Tobin* court overstates the nature of the request for recovery in these cases. The conduct which is offered as supporting the liability—*i. e.*, in this case the negligent operation of the vehicle—is of the kind which has traditionally been held to have been actionable by plaintiffs who had sustained provable damages. The departure that is being urged is as to *the scope of damages that will be recognized as flowing from that conduct.* In this context, we are satisfied that the developments in the fields of medical science and psychiatry do provide the impetus for expanding our legal recognition of the consequences of the negligent act. To arbitrarily refuse to recognize a now demonstrable injury flowing from a negligent act would be wholly indefensible.

The *Tobin* court further attempted to bolster its position by raising the specter of future extensions that may be urged if we depart from the zone of danger theory.[16] We find this attempt to resort to the logical "gimmick" of *reductio ad absurdum* to be of little value in resolving the legitimate questions presented. Under the facts that we are being called upon to decide, the emotional impact upon a mother witnessing the sudden and violent death of her small child is unquestionably as traumatic as would have been the case if the mother had also been within the zone of danger. Recorded history is replete with instances where a mother would willingly have given her own life for that of her child. Thus to attempt to justify ignoring this legitimate and natural response to tortious conduct by positing situations

alleges psychic injury as a result of actually witnessing the defendant's negligent act.

16. The *Tobin* Court argued that once the injury to the mother-third party is recognized, it would be extended to other relatives "and even to sensitive caretakers." 24 N.Y.2d at 616, 301 N.Y.S.2d at 559.

not presented would mock justice and arbitrarily turn a deaf ear upon a compelling claim for relief.

In an attempt to still the concerns of those troubled by "the fear of unlimited liability" the Supreme Court of Hawaii suggested the limiting of recovery "to claims of serious mental distress." *Leong v. Takasaki*, 520 P.2d at 764. We believe this is a reasonable response to the concern. We agree that it would be unreasonable to hold the defendant responsible for the mental distress that may be experienced by the most timid or sensitive members of the community:

> Certainly the law should not compensate for every minor psychic shock incurred in the course of daily living; it should not reinforce the neurotic patterns of our society. At some point, however, a person threatened by severe mental injury should be able to enforce his claim to reasonable psychological tranquillity.

*D'Ambra v. United States*, 338 A.2d at 529 (footnote omitted).

The *Leong* court attempted to achieve an objective standard by defining serious mental distress as being properly found where a reasonable person "normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances" of the event. *Id.* Such a test focuses upon the situation producing the emotional stress and requires it to be a nature that would be likely to produce a response in a person of average sensitivities. In this determination factors such as the context in which the trauma occurred, the development of physical ramifications, and the duration and severity of the emotional distress are available to make the judgment an objective—as opposed to a subjective—one.

The second level of the argument posited by the New York court in *Tobin* concerns the possibility of unduly burdensome liability. That court viewed this possibility as:

> . . . a kind of dollars-and-cents argument. It does not vanish, however, by reference to widespread or compulsory insurance. Constantly advancing insurance costs can become an undue burden as well, and the aggregate

recoveries in a single accident of this kind are not likely to stay within ordinary, let alone, compulsory insurance liability limits.

> *Tobin v. Grossman*, 24 N.Y.2d at 617, 301 N.Y.S.2d at 559–60, 249 N.E.2d at 423.

This view was forcefully attacked in a dissenting opinion written by the late Judge Kenneth B. Keating. Judge Keating pointed out that "[n]ot one piece of evidence is offered to prove that the 'dollar-and-cents' problem will have the dire effects claimed." *Id.*, at 620, 301 N.Y.S.2d at 562, 249 N.E.2d at 525 (dissenting opinion). He further contended that:

> Ever since *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, was decided more than a half century ago, there has been an expanding recognition that the argument concerning unlimited liability is of no merit, yet the aberrations persist. One would imagine that we were here involved with a catastrophic loss. There have already been decisions imposing liability of far greater dimension than can ever arise if we should embark upon a search for "essential justice" in the bystander class of cases.

> *Id.*, 301 N.Y.S.2d at 563, 249 N.E.2d at 525.

The Rhode Island Supreme Court also found this "dollars-and-cents" argument unpersuasive. *D'Ambra v. United States*, 338 A.2d at 530.

It is possible to reasonably circumscribe the area of liability.

This issue raises the question of the extent to which bystander recovery will be permitted.[17] We are confident

---

**17.** The New York court in *Tobin* posited this problem in the following manner:

> The final and most difficult factor is any reasonable circumscription, within tolerable limits required by public policy, of a rule creating liability. Every parent who loses a child or whose child of any age suffers an injury is likely to sustain grievous psychological trauma, with the added risk of consequential physical harm. Any rule based solely on eyewitnessing the accident could stand only until the first case comes along in which the parent is in the

that the application of the traditional tort concept of fore-
seeability will reasonably circumscribe the tortfeasor's liabil-
ity in such cases. Foreseeability enters into the determina-
tion of liability in determining whether the emotional inju-
ries sustained by the plaintiff were reasonably foreseeable to
the defendant.[18]

In the seminal *Dillon* case, the California Supreme Court
identified three factors determinative of whether the injury
to the Plaintiff was reasonably foreseeable:

(1) Whether plaintiff was located near the scene of the
accident as contrasted with one who was a distance away
from it. (2) Whether the shock resulted from a direct

> immediate vicinity but did not see the accident. Moreover, the
> instant advice that one's child has been killed or injured, by
> telephone, word of mouth, or by whatever means, even if delayed,
> will have in most cases the same impact. The sight of gore and
> exposed bones is not necessary to provide special impact on a
> parent.
> *Tobin v. Grossman*, 24 N.Y.2d at 617, 301 N.Y.S.2d at 560, 249
> N.E.2d at 423.
> The absolute bar to recovery mandated by the *Tobin* decision has
> been severely criticized. This criticism is well reflected in Prof.
> Simons' plea that:
> > . . . If a line of circumscription is to be drawn for the sake of
> > public policy, or even in the application of traditional tort princi-
> > ples, it is not more reasonable and humane to draw it somewhere
> > other than at the point where no recovery is allowed simply
> > because drawing the line elsewhere is difficult? . . . .
> Simons, Psychic Injury and the Bystander, *supra*, note 10, at 21.

**18.** We note that other courts considering the question of bystander
recovery have required the presence of the witness-mother at the
accident site also to be reasonably foreseeable to the defendant. *See,
e. g. D'Ambra v. United States*, 354 F.Supp. at 820. *Cf., Wallace v.
Coca-Cola Bottling Plants, Inc.*, 269 A.2d 117, 121 (Me.1970). We
further note that the Rhode Island Supreme Court rejected the
requirement of plaintiff's foreseeable presence. *see, D'Ambra v. Unit-
ed States*, 338 A.2d at 531, and that the *Dillon* case and the majority
of jurisdictions following that case do not impose such a require-
ment. It is foreseeable that third parties will witness an accident.
The legitimacy of the witness' emotional response to the accident is
properly analyzed using the test we set forth in the above text.
Because we believe that our test of the foreseeability of plaintiffs
injuries is sufficient to reasonably circumscribe the area of defend-
ant's liability, and because the presence at or near the accident scene
of third parties is reasonably foreseeable, we do not consider neces-
sary a separate test of foreseeability of presence.

emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Dillon v. Legg*, 69 Cal.Rptr. at 80, 441 P.2d at 920

In elaborating upon these factors, the court stated:

The evaluation of these factors will indicate the *degree* of the defendant's foreseeability: obviously defendant is more likely to foresee that a mother who observes an accident affecting her child will suffer harm than to foretell that a stranger witness will do so. Similarly, the degree of foreseeability of the third person's injury is far greater in the case of his contemporaneous observance of the accident than that in which he subsequently learns of it. The defendant is more likely to foresee that shock to the nearby, witnessing mother will cause physical harm than to anticipate that someone distant from the accident will suffer more than a temporary emotional reaction. All these elements, of course, shade into each other; the fixing of obligation, intimately tied into the facts, depends upon each case.

In light of these factors the court will determine whether the accident and harm was *reasonably* foreseeable. Such reasonable foreseeability does not turn on whether the particular defendant as an individual would have in actuality foreseen the exact accident and loss; it contemplates that courts, on a case-to-case basis, analyzing all the circumstances, will decide what the ordinary man under such circumstances should reasonably have foreseen. The courts thus mark out the areas of liability, excluding the remote and unexpected.

*Id.*, at 80–81, 441 P.2d at 920–21 (emphasis in the original). Applying this standard to the case before it, the California court reversed the summary judgment awarded the defendants on facts almost identical with those now before us. A negligently driven automobile struck and killed Erin Dillon,

an "infant" as she crossed a road. Her sister Cheryl, also an infant, was standing close to her and witnessed the accident. Their mother, standing a little distance away, witnessed the accident and sustained great emotional disturbance and shock. The trial court ruled that Cheryl was within the zone of danger and that an action for mental distress begun on her behalf could be brought, but ruled that Mrs. Dillon was outside the zone of danger and was not owed a duty of care by the driver of the car. The California Supreme Court reversed, and, applying the factors above, held that Mrs. Dillon was within a zone of emotional harm and could bring her action for psychic distress.

The *Dillon* factors and large parts of that opinion were adopted *verbatim* by the court in *D'Amicol v. Alvarez Shipping Co., Inc.*, 31 Conn.Super. 164, 326 A.2d 129 (1973). That court upheld the right of a father and mother to recover damages for the shock and fright they incurred from witnessing the death of their young son in a traffic accident. The parents and the child were riding in the same car at the time of the accident.[19]

### III.

In summary, we conclude that we cannot accept the callous view of the *Tobin* court that the possibility of a sudden and violent termination of a young life is a risk assumed in child rearing and does not require recovery where mental distress results from the witnessing of such an

---

**19.** The Supreme Court of Washington also has employed the three *Dillon* factors. In *Schurk v. Christensen*, 80 Wash.2d 652, 497 P.2d 937 (1972) (en banc), that court denied recovery by a mother who claimed mental distress arising out of being informed that her 5-year-old daughter had been sexually molested by a teenage boy over a period of months.

The Australian Capital Territory enacted a statute pre-dating *Dillon* but setting forth the principles enunciated in that case. Law Reform (Misc. Provisions) Ordinance 1955, I Laws of the Australian Capital Territory, part vii, § 24(1) (1960). This statute was quoted in Speiser & Malawer, An American Tragedy: Damages for Mental Anguish of Bereaved Relatives in Wrongful Death Actions, 51 Tulane L.Rev. 1, 13 n. 53 (1976).

event.[20]   We are satisfied that public policy demands that we not permit the application of the zone of danger concept to deny recovery merely because of the nature of the damage.   We are also satisfied that by the proper application of the tort concept of foreseeability the area of liability may be reasonably circumscribed.

■   In applying the preceding discussion to the facts presented in the instant appeal, it is apparent that the trial court prematurely sustained preliminary objections to the fourth count of the complaint on the basis that it did not state a cause of action.   Since we have determined that a tortfeasor's liability for mental distress is not to be denied solely because the plaintiff was beyond the zone of physical danger, we must examine whether the injuries sustained by appellant were reasonably foreseeable.   It is clear that appellant's injuries were of a nature reasonably foreseeable under the circumstances alleged.   Where the bystander is a mother who witnessed the violent death of her small child and the emotional shock emanated directly from personal observation of the event, we hold as a matter of law that the mental distress and its effects is a foreseeable injury.[21]

Regardless of whether Mrs. Sinn will be ultimately successful in recovering the damages she sustained, we believe:

**20.**   The *Tobin* court stated that:
> The risks of indirect harm from the loss or injury of loved ones is pervasive and inevitably realized at one time or another. *Only a very small part of that risk is brought about by the culpable acts of others. This is the risk of living and bearing children.* It is enough that the law establishes liability in favor of those directly or intentionally harmed.
> 24 N.Y.2d at 619, 301 N.Y.S.2d at 561–62, 249 N.E.2d at 424. (emphasis added).

We are not the only court to reject this harsh view. *See D'Ambra v. United States*, 354 F.Supp. 810, 821 (D.R.I.1973).

**21.**   As stated earlier, *see* note 15, we need not here consider the case where the mother is notified of the accident by another.   Nor do we consider the situation where the relationship between the plaintiff-bystander and the accident victim is more remote.   These are questions which may properly be left for another day.   Jurisprudentially, the remote and unexpected can best be excluded by reaching these issues on a more appropriate record.

the gravity of appellant's injury and the inherent humanitarianism of our judicial process and its responsiveness to the current needs of justice dictate that appellant be afforded a *chance* to present [her] case to a jury and perhaps be compensated for the injury [she] has incurred *Niederman*, 436 Pa. at 404, 261 A.2d at 85 (emphasis in the original).

The order of the Court of Common Pleas sustaining the appellee's demurrer to Count IV of the complaint is hereby reversed. The case is remanded to the Court of Common Pleas for proceedings consistent with this opinion.

EAGEN, C. J., filed a concurring opinion.

LARSEN, J., concurred in the result.

ROBERTS, J., filed a dissenting opinion in which O'BRIEN, J., joined.

EAGEN, Chief Justice, concurring.

The various positions and views have been extensively discussed in the scholarly opinions of Mr. Justice Roberts and Mr. Justice Nix and need no further explication by me. Needless to say, the problems presented instantly are extremely difficult. In the hope of rendering justice and at the same time not imposing any unreasonable burdens, I have reached the following conclusions. Recovery should be permitted in cases of this nature even where the plaintiff is beyond the scope of danger if (1) the plaintiff is closely related to the injured party, such as a mother, father, husband or wife; (2) the plaintiff is near the scene of and views the accident; (3) the plaintiff suffers serious mental distress as a result of viewing the accident and physical injury or suffers serious mental distress and there is a severe physical manifestation of this mental distress.

Justice mandates that the plaintiff be given the opportunity of proving that she meets the foregoing requirements. Hence, I concur in the order remanding the case for a new trial.

ROBERTS, Justice, dissenting.

"Rachael weeping for her children refused to be comforted: because they were not." Jeremiah, xxxi, 15.

The depth and inconsolable nature of a parent's loss at the death of a child is unique in human experience. And where that death is caused by another's irresponsible act, it is not unexpected that parents turn to the law to seek redress for the harm done to them.

"The law of torts . . . is concerned with the allocation of losses arising out of human activities. . . .
'The purpose of the law of torts is to adjust these losses, and to afford compensation for injuries sustained by one person as the result of the conduct of another.' "

Prosser on Torts, 4th ed. § 1 (1971) quoting Wright, "Introduction to the Law of Torts," 8 Camb.L.J. 238 (1944).

Yet even the law must recognize that not every human loss arising out of another's conduct constitutes a legal injury for which compensation shall be available. Prosser, supra, § 1. The ineluctable fact is that among all the jurisdictions which have addressed the question now before us, in only one, Hawaii, is judicial redress provided for appellant's injury. This is not explained, as Mr. Justice Nix would suggest, by a national judicial indifference to the emotional distress caused either by the death of a loved one or the shock, for anyone, of immediately perceiving a violent death. It is explained, rather, by the foundational jurisprudential wisdom that recovery justified only by arbitrary rules and distinctions must be avoided. This is true not only because arbitrary distinctions are fundamentally unfair, but also because, of course, they defy rational application in future cases, the cornerstone of the law. Because Mr. Justice Nix's opinion can rest only on arbitrary distinctions, I must dissent.

The crux of appellant's injuries is described in paragraphs 26, 27 & 28 of the Fourth Count of the Complaint:

"26. The Plaintiff became hysterical, unnerved, and emotionally shattered as she viewed the Defendant's automobile strike and kill her daughter, Lisa Anne Sinn.

27. As a result of watching the aforementioned accident, the Plaintiff suffered a shock to her nerves and nervous system, and sustained grievous mental pain and suffering resulting in severe depression and an acute nervous condition.

28. As a result of the foregoing, Plaintiff was required to expend money for medicines and/or tranquilizers, and may be required to expend considerable sums for the treatment of her resulting injuries and mental suffering in the future."

While Mr. Justice Nix summarizes appellant's complaint as seeking damages for physical and mental injuries, the complaint reveals only a claim for emotional injuries. See Restatement (Second) Torts, § 436 A, comment c (1965).[1] Further, the complaint seeks, in addition to compensation for emotional injuries, damages for future mental suffering. Thus, the novel issue truly presented by this complaint is whether a plaintiff-parent whose safety is never at risk, who suffers no physical injury, but who witnesses a fatal accident involving her children should be allowed to recover from the tortfeasor for negligent infliction of emotional distress and future mental suffering.

I

Mr. Justice Nix, announcing the judgment of the Court, asserts that there is "no sound policy basis" upon which to distinguish this case from *Neiderman v. Brodsky,* 436 Pa. 401, 261 A.2d 84 (1970). Reason, as well as the overwhelm-

---

1. Comment c: "The rule stated in this Section applies to all forms of emotional disturbance, including temporary fright, nervous shock, nausea, grief, rage, and humiliation. The fact that these are accompanied by transitory, non-recurring physical phenomena, harmless in themselves, such as dizziness, vomiting, and the like, does not make the actor liable where such phenomena are in themselves inconsequential and do not amount to any substantial bodily harm. On the other hand, long continued nausea or headaches may amount to physical illness, which is bodily harm; and even long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character. This becomes a medical or psychiatric problem, rather than one of law."

ing weight of authority, demonstrates that the majority is in error.

In *Neiderman,* recovery was sought for physical injuries. The issue there was whether those injuries could be proximately traced to the tortfeasor's negligence when the physical injury followed emotional distress caused by the tortfeasor, rather than a physical impact. We held that physical injuries such as the heart attack suffered by the *Neiderman* plaintiff clearly could be proximately caused by emotional distress or fear for one's own safety and that one who puts another in risk of physical safety is liable for the physical injuries caused as a result. Thus, in *Neiderman,* recovery was permitted for physical injuries suffered as a result of emotional distress brought on by another's negligent threat to the plaintiff's physical safety.

Here, there was no threat to plaintiff's physical safety and plaintiff has suffered no physical injury. Plaintiff seeks recovery only for mental distress caused by the defendant's negligent interference with another's safety. Since in *Neiderman,* the plaintiff sought recovery for his physical injuries and for the pain and suffering which accompanied those injuries, but not for the emotional distress which caused the injury, that case in no way controls today's decision. Indeed, there is nothing inconsistent in recognizing that physical injuries may be caused by mental distress but not awarding damages for mental distress suffered without physical consequence. Further, there is nothing inconsistent about permitting recovery where the distress for one's own safety causes physical injury, but denying recovery where one is distressed only for another's safety.

No one could seriously deprecate the severity of the emotional shock plaintiff here claims to have sustained. But the distinctions between recovery in *Neiderman* and recovery here cannot be ignored. Here, if there is no reasonable measure of plaintiff's pain, then any recovery will be essentially speculative. Then, too, the nature of our society requires of each of us a remarkable degree of emotional fortitude. It is not unreasonable to draw the line between

178

that degree which is required and that which is not by reference to that emotional distress which causes serious physical injury or harm. And it cannot be denied that if not the genuineness, then at least the intensity and thus the nature of the injury, may be difficult to assess where it causes no physical injury.

Even the Restatement (Second) of Torts, supra, distinguishes between recovery for physical harm caused by mental distress, and recovery for mental distress, permitting recovery only in the first instance.[2] Compare §§ 436 & 436 A.

Similarly, the Supreme Court of California has repeatedly reaffirmed that *Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 440 P.2d 912, 29 A.L.R.3d 1316 (1968) (in bank), upon which Mr. Justice Nix places heavy reliance, permits recovery only where the emotional shock of witnessing an accident causes physical injuries. "[T]he traumatic shock which plaintiff suffers must result in some form of physical injury." *Krouse v. Graham,* 19 Cal.3d 59, 137 Cal.Rptr. 863, 871, 562 P.2d 1022, 1030 (1977) (in bank). Accord *Hoyem v. Manhattan Beach City School District,* 22 Cal.3d 508, 150 Cal.Rptr. 1, 585 P.2d 851 (1978); *Justus v. Atchison,* 19 Cal.3d 564, 139 Cal.Rptr. 97, 565 P.2d 122 (1977) (in bank). So, too, where emotional distress has not caused physical injury recovery has been denied by the Illinois Supreme Court, *Neuberg v. Michael Reese Hospital & Medical Center,* 60 Ill.App.3d 679, 18 Ill.Dec. 62, 377 N.E.2d 215 (1978), the Massachusetts Supreme Judicial Court, *Dzionkonski v. Babineau,* 380 N.E.2d 1295, (1975) the Rhode Island Supreme

2. And as the majority notes, even where physical harm is caused by emotional distress, the Restatement takes a position against recovery where the distress is not for one's own physical safety, but is for one's child's.

"Emotional Distress Unintended

\* \* \* \* \* \*

(2) The rule [of liability] in Subsection (1) has no application to illness or bodily harm of another which is caused by emotional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other."

Restatement (Second) Torts, supra, § 313.

Court, *D'Ambra v. United States,* 338 A.2d 524 (1975) and the Arizona Supreme Court, *Keck v. Jackson,* 593 P.2d 668 (1979) (en banc). *D'Amicol v. Alvarez Shipping Co.,* 31 Conn.Super. 164, 326 A.2d 129 (1973), cited by the majority appears to have been reconsidered, *McGovern v. Piccolo,* 33 Conn.Super. 225, 372 A.2d 989 (1976) (court applies zone of danger rule and questions whether recovery permitted even for emotional distress of mother when caused by witnessing injury to child, and mother within zone of danger). In any event, *D'Amicol,* unlike here, involved a physical injury to the plaintiff caused by emotional distress.

The Tennessee Supreme Court continues to limit recovery to those suffering physical injury as a result of fear for one's own safety when in zone of danger. *Shelton v. Russell Pipe & Foundry Co.,* 570 S.W.2d 861 (1978). Vermont, too, has adopted this rule. *Guilmette v. Alexander,* 128 Vt. 116, 259 A.2d 12 (1969). Even Washington, one of the most liberal states in awarding damages for emotional distress requires some physical symptoms of the emotional distress for recovery. *Hunsley v. Giard,* 87 Wash.2d 424, 553 P.2d 1096 (1976). Hawaii stands completely alone in permitting recovery in the absence of any physical harm. *Leong v. Takasaki,* 55 Haw. 398, 520 P.2d 758 (1974).

Thus with the overwhelming majority of these courts, I would reject permitting recovery for one whose safety was never at risk and whose emotional distress caused no physical injury.

## II

Mr. Justice Nix erroneously assumes that the only causation problem which could possibly arise here is the same kind as we have already held unproblematic in *Neiderman,* supra. But here, to permit recovery, we must find not that physical harm can be proximately caused by mental distress but that it is possible to distinguish between that emotional distress caused appellant by witnessing the accident and that caused

by the natural grief and loss which accompanies the death of a child.

As the Court of Appeals of New York foresaw a decade ago:

"In this very case, as already noted, the eyewitness limitation provides no rational practical boundary for liability. The distance from the scene and time of notice of the accident are quite inconsequential for the shock more likely results from the relationship with the injured party than what is seen of the accident. The age of the child, always assumed to be relevant, is difficult to define or limit. Indeed, it may be callous to assess as lesser the loss or injury of an older child than a younger one. Nor can the father, the grandparents, the siblings and other relatives, or even others *in loco parentis,* be excluded on any acceptable rational basis, although, to be sure, distinctions can be made and verbalized. It is quite significant, too, that the now discarded caveat in the first Restatement referred to spouses as possibly being entitled to recover for shock and its consequences. Indeed, whichever way one turns in permitting a theory of recovery one is entangled in the inevitable ramifications which will not stay defined or limited. There are too many factors and each too relative to permit creation of only a limited scope of liability or duty.

"Beyond practical difficulties there is a limit to attaining essential justice in this area. While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world. Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree. The risks of indirect harm from the loss or injury of loved ones is pervasive and inevitably realized at one time or another. Only a very small part of that risk is brought about by the culpable acts of others. This is the risk of living and bearing children. It is enough that the

law establishes liability in favor of those directly or intentionally harmed."

*Tobin v. Grossman,* 24 N.Y.2d 609, 618–19, 301 N.Y.S.2d 554, 561–62, 249 N.E.2d 419, 424 (1969). See *Scarf v. Koltoff,* 242 Pa.Super. 294, 363 A.2d 1276 (1976) (Spaeth, J.) (quoting *Tobin,* supra.) In fact, one may wonder whether it is not less injurious to a parent's mental state to see the accident which causes the death of his child than never to know exactly its circumstances. Neither the opinion of Mr. Justice Nix nor the parties cite us to any medical or psychological authority on this issue. And a common sense compels the conclusion that no jury could evaluate the difference between the damages due to the emotional distress of actually witnessing the accident from those due to learning of and living with the fact that one's child suffered an accidental and violent death. This is especially true with respect to "future mental suffering" for which appellant also seeks recovery.

Mr. Justice Nix demonstrates his failure to grasp the special causation problems here present with his assertion that those courts which have limited recovery to cases where emotional distress caused some physical injury have imposed the "device" of physical injury merely to "guarantee the genuineness of the claim." The problem of isolating the damages caused by the injury complained of here is so great that without physical harm courts would be at a loss to know how to relate damages to injury:

> "Despite the admitted artificiality of linking recovery for mental distress to the possibility of physical injury, this limitation does reflect the core notion of some reasonable relation or nexus between the negligent conduct and the injury sued upon."

*D'Ambra,* supra, 338 A.2d at 530.

> "The problems in finding causation in fact should not be minimized. . . . [T]here is no escaping the problem of whether the injuries sued on should be attributed to the

shock of witnessing the accident or to the fact of the victim's death."

Id. 338 A.2d at 529, n. 5.

## III

The central problem this kind of action brings before the courts is not that of the genuineness of the emotional distress, but that of rationally limiting defendant's liability. The opinion of Mr. Justice Nix disingenuously would have us believe that today we need not consider whether it is possible to limit recovery solely to plaintiff's class. If, however, there is no principled means of distinguishing this plaintiff from any other, then to decide her case is to decide the question the majority claims is not before us. One can say that question is not before us only by assuming its answer.

Mr. Justice Nix asserts that he sufficiently limits liability by narrowing recovery to "foreseeable injuries." But what constitutes a foreseeable injury is the conclusion of legal analysis, not its principal tool. Indeed there is remarkable disagreement about how to distinguish the "foreseeable" from the "unexpected." In Massachusetts one who does not witness an accident to a third party may still suffer foreseeable emotional distress from learning of the death. *Dzionkonski,* supra. In Hawaii, such injuries are not foreseeable. *Kelly v. Kokua Sales & Supply,* 56 Haw. 204, 532 P.2d 675 (1975). In Connecticut, seeing an accident will foreseeably cause emotional distress, while hearing one will not. Compare *D'Amicol,* supra, and *McGovern,* supra. In California, witnessing a negligent stillbirth does not create a foreseeable injury, *Justus,* supra, while coming upon an already injured victim may, *Archibald v. Braverman,* 275 Cal.App.2d 253, 79 Cal.Rptr. 723 (1969).

In Rhode Island a mother may recover, *D'Ambra,* supra, but not a close personal friend. In Arizona, anyone who was a close friend of the victim may suffer a foreseeable injury. *Keck,* supra. In Hawaii, not every one who is close will

suffer a foreseeable injury, but a step-grandson's emotional distress is foreseeable. This variety of rules "limiting" recovery is eloquent testimony that there is no natural non-arbitrary way to limit liability for this injury.

> "A mother who sees her child suffer and die an hour, a day or even a week after an accident is no less traumatized than one who comes upon the scene 'immediately' after an accident. And what of the woman who learns of her child's accidental death at some time and place distant from the scene of the accident or who learns of her cousin's death under like circumstances?"

*McGovern,* supra, 372 A.2d at 989.

All the injuries which courts have compensated have been, in Mr. Justice Nix's terms, "legitimate emotional responses." Even Prosser, a firm supporter of recovery in these cases, admits that foreseeability does not limit liability. He limits liability to immediate relatives suffering physical harm because he realizes some line must be drawn.

> "It would be an entirely unreasonable burden on all human activity if the defendant who has endangered one man were to be compelled to pay for the lacerated feelings of every other person disturbed by reason of it, including every bystander shocked at an accident, and every distant relative or the person injured, as well as his friends."

Prosser, supra, § 54 at 334. But as Justice Joslin noted in dissent in *D'Ambra,* supra, limiting a defendant's liability to members of the injured person's immediate family who observed the accident is adopting a rule which

> "cannot be applied even-handedly and . . . will therefore lead to admittedly arbitrary results . . . . It would . . . frustrate a basic purpose and policy underlying the scope of liability rules, namely, to achieve consistently just results by providing for even and predictable resolutions of private disputes . . . . I fear that arbitrary case-by-case determinations will result in more injustice over time than would the uniform denial of

recovery to those who do not reasonably fear for their own safety. For these reasons I agree with the great weight of authority [1] and answer the certified question in the negative."

338 A.2d at 536 (Note 1: Most of the cases can be found in Annot. 18 A.L.R.2d 220 et seq. (1951) and Annot. 29 A.L.R.3d 1337 et seq. (1970). The American Law Institute, which in 2 Restatement Torts § 313 (1934) in a caveat refrains from expressing any opinion on the question, in 2 Restatement (Second) Torts § 313 (1965), strikes that caveat and on facts substantially identical to those of the certified question substitutes a rule of nonliability.)

Mr. Justice Nix's foreseeable injury "test," adopted from *Dillon,* predicates recovery upon plaintiff's (1) witnessing an accident, (2) close-up (3) in which a "close" relative is injured. This test, ostensibly simple, will produce monumental problems both of application and fair limitation. If recovery is extended in the present case, can the law close its eyes to the emotional distress of bystanders who recently witnessed the traumatic amputation of a young woman's hand by a subway car? Does the majority's "rule" give us any principle at all in the following situation? Three siblings get off a bus. Two attempt to cross the street. The third begins to walk away from them down the block. A moment later he hears screeching car brakes, screams and one of his siblings yelling, "My God, Jim is dead." Does the brother have a foreseeable injury? Is there any way to judge whether his emotional distress "resulted from a direct emotional impact upon the plaintiff from the sensory and contemporaneous observance of the accident" or from "learning of the accident from others after its occurrence?" How many steps down the street distinguish immediate observation from indirect learning? As Judge Spaeth has noted, "The criteria suggested by Prosser and adopted in *Dillon* are not reasoned but arbitrary, for they are unsupported on any policy capable of uniform application." *Scarf,* supra, 242 Pa.Super. at 299–300, 363 A.2d at 1276 (footnotes omitted).

## IV

Perhaps most telling is the consideration that Mr. Justice Nix's allowance of a cause of action here, in reality, permits circumvention of the Commonwealth's wrongful death statute, Act of April 15, 1851, P.L. 669, § 19; Act of April 26, 1855, P.L. 309, § 1, as amended, 12 P.S. §§ 1601 et seq. This legislation specifically provides recovery to a mother injured by the tortfeasor's negligent killing of her child.

"The law was in 1855 altered, and the right to sue was conferred on parents for the loss of children. . . . This right was a new and independent right given by positive law—not cast upon them by survivorship as for an injury to the decedent. It is for the wrong done to them."

*The Pennsylvania R.R. Co. v. Zebe,* 33 Pa. 318, 329 (1858). Thus, the Act of 1855 already provides a cause of action for a tortfeasor's direct injury to the plaintiff, for the wrong done to her by his negligence. As the Connecticut court in *McGovern* noted, to permit additional recovery where the plaintiff is closely related to the victim, "raises serious policy questions. The defendant in such a case is already liable in one tort action for wrongful death." 372 A.2d at 989.

Damages under wrongful death in Pennsylvania have always been limited to pecuniary damages and nothing is recoverable for "the mental suffering occasioned to the survivors by the death and nothing may be allowed as *solatium,* that being incapable of pecuniary estimate. . ." *Zebe,* supra at 328. Recovery here only undermines over a century's adherence to the legislative policy that compensation for damages suffered by the class of individuals to which plaintiff belongs is through the wrongful death statute.

I would affirm the order of the Superior Court affirming the order of the court of common pleas sustaining appellee's preliminary objections in the nature of a demurrer to Count 4 of appellant's complaint.

O'BRIEN, J., joins in this dissenting opinion.